# IN THE COURT OF APPEALS OF IOWA

No. 21-0992
Filed February 22, 2022

**IN THE MATTER OF THE GUARDIANSHIP OF B.B.,**

**Q.B., Father,**
    Appellant.
_____

Appeal from the Iowa District Court for Davis County, William Owens, Associate Juvenile Judge.

A father appeals the appointment of the child's maternal aunt as guardian. **AFFIRMED.**

Jonathan Willier, Centerville, for appellant.

Bryan J. Goldsmith and Carly M. Schomaker of Gaumer, Emanuel, Carpenter & Goldsmith, P.C., Ottumwa, for appellee guardian.

Cynthia D. Hucks of Box and Box Attorneys, Ottumwa, attorney and guardian ad litem for minor child.

Considered by Bower, C.J., and Vaitheswaran and Chicchelly, JJ.

**BOWER, Chief Judge.**

The father, Q.B., appeals the appointment of a guardian for his seventeen-year-old child, B.B.[1]  The father contends the statutory requirements for the appointment of a guardian have not been met and the court did not properly consider the parental preference.  Because there is clear and convincing evidence the father abdicated his parental involvement in the life of the child, the parental preference has been rebutted, and the appointment of the maternal aunt as the child's guardian is in the child's best interests.  We affirm.

**I. Background Facts.**

M.Y. is B.B.'s maternal aunt.  In the summer of 2018, fourteen-year-old B.B.'s older sisters, K.B. and C.B., contacted M.Y. and stated they were worried about B.B.[2]  They told M.Y. there was ongoing drug use and people in and out of the parental home.  The sisters reported B.B. did not feel safe there.  M.Y. visited B.B. in the family home, found the environment unhealthy and unsafe, and brought B.B. home with her.  The child has resided with M.Y. since August 2018.

B.B.'s parents have a history domestic violence.  They divorced in September 2019.  Yet, the father continues to live in the mother's home off and on.  Under the divorce decree, the parents have joint legal custody of B.B., with the mother having physical care and the father having "visitation rights every other weekend."  Because of the father's low income, he was not ordered to pay child support.

---

[1] J.B., the mother, does not appeal.
[2] Both older sisters left home as teenagers.

On February 25, 2020, M.Y. filed a petition to be appointed as guardian of B.B. on an involuntary basis. M.Y. was appointed temporary guardian. Before the hearing for a permanent guardianship and at the request of the guardian ad litem (GAL), the court ordered both parents to undergo hair-stat drug testing. Neither complied.

At the hearing, M.Y. testified B.B. came to live with her in late July or early August 2018 because the conditions in the parental home were unhealthy. She described the home as a flophouse that was filthy, with numerous people coming and going and ongoing drug use. B.B. witnessed someone overdose in the home, who later died from a second overdose. B.B. had very little structure in the parental home, no curfew, and no parental guidance. She was not registered for the upcoming school year and did not have regular doctor or dentist appointments. When M.Y. retrieved B.B.,[3] the parents "shunn[ed]" her for going to live with M.Y. After several months, the parents seemed to accept B.B.'s living arrangement and made no objections until M.Y. petitioned for guardianship.

According to M.Y., B.B. occasionally visits her parents and "hangs out with them" but lives with M.Y.[4] The parents have told B.B. that if the guardianship continues they will not have contact with her, which is emotionally "devastat[ing]" to B.B. M.Y. testified B.B. struggles with severe depression and anxiety. B.B. takes medication and regularly visits a counselor to address her mental-health issues. M.Y. testified B.B. loves her parents but wants to live with M.Y.

---

[3] M.Y. testified, "At the time I took [B.B.], it was due to the drugs and the neglect of [B.B.]"

[4] B.B. also spent the quarantine period at her mother's home when M.Y. had COVID-19 in November 2020.

B.B. receives $280 per month by virtue of the father's disability.[5] The father has provided no other financial support to M.Y. since 2018. M.Y. obtained health coverage for B.B. after the parents allowed her insurance to lapse in 2019. The father has a history of substance-use-related offenses, mental-health issues, and domestic violence. He has rarely attended B.B.'s school activities.[6] B.B. visits her father on her own terms. Since the temporary guardianship was put in place, Q.B. has not requested B.B.'s extracurricular schedule or information concerning educational matters or medical issues.

The GAL made a professional statement that B.B. loves her parents and did not want to have to testify in the proceedings, but she did not want to move from M.Y.'s home. B.B. acknowledges she is comfortable in M.Y.'s care and custody and knows it is best for her own stability to remain with M.Y. The GAL observed that B.B. reluctantly acknowledges her father's mental-health concerns, deficiencies from his brain injury, and his temper. B.B. told the GAL that when she spent time in the parents' home while M.Y. was isolating,

> there was an overwhelming amount of fighting going on in the house; that it was very difficult for her, and at that point in time she once again became tearful and reiterated that she doesn't have much time until she's eighteen. She just wants to finish high school, and she just wants to be a kid now.

The GAL recommended the court continue the guardianship.

---

[5] The father suffered a traumatic brain injury and spinal cord injury in a motor vehicle accident in 2008. He takes prescription medications for pain management.
[6] M.Y. testified B.B. would have fifteen to twenty activities per month the parents could have attended. The parents attended perhaps two or three in the time B.B. has lived with M.Y.

Q.B. testified at the hearing and contested the guardianship. He testified he gets disability payments because of a spinal cord injury he suffered in a car wreck, which had affected his ability to be the "head of the household." He also testified he provided financial support for B.B. via disability payments and that he saw her now as much as he did previously. He stated he was taking only prescribed medications and his doctor told him "she didn't think [a hair follicle test] was proper, that she had—that she knew that I wasn't on drugs and that I was just fine and capable of taking care of my kids." Q.B. also testified he had been diagnosed with mental illness and he did not attend B.B.'s activities because he did not want his mental illness to embarrass B.B. He stated his wish was that B.B. live with her mother and they would be there to get her through college. He denied domestic abuse, but acknowledged he had struck the mother and blackened her eye thinking she was an attacker creeping up on him.[7] Q.B. also admitted he had a history of illegal drug use and that there was an issue of drugs being used in the family home (though he stated he was not living there when B.B. left).

In granting M.Y.'s petition for guardianship, the juvenile court recognized there exists a parental preference for custody and found the preference was not applicable:

> [Q.B.] took a very "hands off" approach toward [B.B.] While [B.B.] did have visits with her parents, neither [the mother] or [the father] took an active role in supporting [her] financially, or providing support or oversight over her school or extracurricular activities. The parents would likely have continued this approach until [B.B.] attained majority age had [M.Y.] not sought appointment as [her] guardian.

---

[7] Q.B. was charged with domestic abuse assault in June 2018. He was convicted of possession of controlled substance, third or subsequent offense, in January 2019.

> [Q.B.] testified he had "no problem" with [M.Y.] caring for [B.B.] until the guardianship paperwork was filed.
>
> Based on the record the evidence is both clear and convincing [the parents] did, in fact, "take an extended holiday" from their responsibilities and duties as [B.B.'s] guardian for the period from July or August 2018 until February 2020 when the guardianship petition was filed. As such, they cannot rely on any parental preference for custody.

The juvenile court found the requirements of Iowa Code section 232D.204(1) (2020) were proved by clear and convincing evidence: M.Y. had acted as de facto guardian, and the parents had by their inaction demonstrated a lack of consistent parental participation in the minor's life. The court concluded guardianship is necessary to safeguard the best interests of the child.

Q.B. appeals.

## II. Scope and Standard of Review.

Our standard of review of the establishment of a guardianship of a minor is de novo. *In re Guardianship of J.M.*, No. 20-1638, 2021 WL 4304224, at *2–3 (Iowa Ct. App. Sept. 22, 2021) (summarizing the history of the amendments and the resulting standard of review). "With de novo review, we are deferential to the district court's factual findings but are not bound by them, and we make our own legal conclusions with no deference to the district court's conclusions of law." *Id.* at *3.

## III. Discussion.

The father contends the statutory requirements for appointment of a guardian have not been met and the court did not properly consider the parental preference. On our de novo review, we disagree with both contentions.

Iowa Code section 232D.204(1) authorizes the juvenile court to appoint a guardian for a minor without the consent of the parent if the court finds both of the following by clear and convincing evidence: "(a) [t]here is a person serving as a de facto guardian of the minor"[8] and "(b) [t]here has been a demonstrated lack of consistent parental participation in the life of the minor by the parent." Though no longer explicit in the statute, the parental preference remains. *See In re Guardianship of L.Y.*, ___ N.W.2d ___, ___, 2022 WL 127956, at *8 (Iowa 2022) (noting "the constitutionally based parental preference" survives the redrafted provisions concerning guardianships of minors). But, "a parent who has taken 'an extended holiday from the responsibilities of parenthood' may not take advantage of the parental preference for custody." *In re Guardianship of Stewart*, 369 N.W.2d 820, 823 (Iowa 1985) (citation omitted). This principle of an extended holiday from parental responsibilities is embodied in the language of section 232D.204(1)(b)— "a demonstrated lack of consistent parental participation in the life of the minor by the parent."

The statute provides further guidance:

> In determining whether a parent has demonstrated a lack of consistent participation in the minor's life, the court may consider all of the following:
>
> (1) The intent of the parent in placing the custody, care, and supervision of the minor with the person petitioning as a de facto guardian and the facts and circumstances regarding such placement.
>
> (2) The amount of communication and visitation of the parent with the minor during the alleged de facto guardianship.

---

[8] The father does not contest the aunt has been a "de facto" guardian. *See J.M.*, 2021 WL 4304224, at *5 (defining de facto guardian as "a person who is serving as a custodian of a child as if appointed by a court to do so, but who does not have a formal court order granting such authority").

(3) Any refusal of the parent to comply with conditions for retaining custody of the minor set forth in any previous court orders.

Q.B. argues there has *not* been a demonstrated lack of consistent parental participation in the life of the B.B. on his part because he continued to provide financial support via his disability checks and because he has had as much contact with B.B. as he had before B.B. went to live with M.Y. He sets an extremely low bar for parental participation in the life of his child.

Q.B. testified he was not living with fourteen-year-old B.B. and the mother in July or August 2018 when M.Y. received a call that fourteen-year-old B.B.'s welfare was at risk in her own home. His absence is telling. Although a parent does not lose the parental preference when the parent seeks help from others to care for their children when in a time of need, Q.B. did not seek help in providing care for B.B. *See In re Guardianship of Knell*, 537 N.W.2d 778, 783 (Iowa 1995).

It was Q.B.'s other children who sought help for B.B. and expressed concern about the conditions of the family home. M.Y. had B.B. move in with her. Q.B. and the mother divorced in 2019, and Q.B. stipulated the mother would have physical care of the child—even when the child was living elsewhere. And from the time B.B. left in 2018 to the time M.Y. made application to be her guardian eighteen months later in February 2020, Q.B. was content to allow M.Y. to provide for B.B.'s daily care, provide her with a home, arrange for her medical and dental care, arrange for her to be registered for school, and support her involvement in school and extracurricular activities. The court found that Q.B.—by his inaction—demonstrated a lack of consistent parental participation in B.B.'s life:

> The evidence is quite clear—including testimony by [Q.B.]—that the parents were content with [B.B]'s placement with [M.Y.] until

February 2020 when [M.Y.] filed her petition for guardianship. To her credit, [M.Y.] has encouraged [B.B.] to maintain contact with her parents, and has allowed regular face-to-face and even overnight visits. Those visits have continued despite the contentious nature of the guardianship proceeding—though [B.B.] has chosen not to have an overnight visit since January 2021. [M.Y.] also testified . . . [Q.B.] has had no communication with her for about two years regarding [B.B.]'s welfare. It is also worth [noting] that in an effort to determine whether parents' drug use might impact [B.B.]'s well-being and safety the attorney for the protected minor asked the court to direct the parents participate in a random drug test. The court ordered the parents to participate in drug testing, but the parents have refused to engage in testing.

We must consider the child's immediate and long-range best interests. *Id.* at 781. The GAL opined staying with M.Y. was in the child's best interests, where B.B. could finish her high school years and "be a kid." We agree and therefore affirm.

**AFFIRMED.**